**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------X

ADAM BARLEY,

Plaintiff,

Case No.: 3:26-cv-1493 (AJB/ML)

-against-

EDUCATION PLUS CORPORATION d/b/a THE FAMILY FOUNDATION SCHOOL; EMMANUEL ARGIROS a/k/a MICHAEL ARGIROS; CINDY ARGIROS a/k/a “CINDY RAY”; BETTY ARGIROS; MICHAEL LOSICCO; ROXANNE LOSICCO a/k/a “ROXY”; CHRISTOPHER STEIN; EDWARD ANDERSON; RANDY WHITING; JOSEPH PETRIELLA; MATTHEW DINGLE; THE EASTRIDGE CORPORATION a/k/a HIGH RIDGE PROPERTY COMPANY, Inc.; LACKAWANNA COLLEGE; NATIONAL ASSOCIATION OF THERAPEUTIC SCHOOLS AND PROGRAMS; NBT BANK, N.A.; NBT BANCORP INC.; THE HANCOCK HERALD; VILLAGE OF HANCOCK, NEW YORK; VILLAGE OF HANCOCK POLICE DEPARTMENT; DELAWARE COUNTY SHERIFF’S OFFICE; COUNTY OF DELAWARE, NEW YORK; DELAWARE COUNTY BOARD OF SUPERVISORS; KASOS CO FAMILY LP; KASOS ENTERPRISES LLC; CHAPEL HILL LAND HOLDINGS LLC; and K9-5 INC.

Defendants.

---------------------------------------------------X

**VERIFIED COMPLAINT**

*Jury Trial Demanded*

**PRELIMINARY STATEMENT**

**1.** For decades, Defendants operated the Family Foundation School ("FFS") disguised to the public, to parents, to students, and to courts as a therapeutic boarding school for adolescents. In reality, FFS was a racketeering enterprise built to enrich the Argiros family through tuition fraud, forced child labor, and the systematic sexual exploitation of vulnerable minors. The Argiros family and their co-defendants recruited minors from across the United States, transported them across state lines, and subjected them to physical coercion, psychological abuse, and sexual exploitation, while complicit local institutions suppressed all reporting and oversight in exchange for the financial and political patronage of the Argiros family.

**2.** The tuition payments extracted from families, school districts, and state agencies funded the Argiros family's private estate, the same estate that enrolled minor students were forced to construct, maintain, and farm without compensation under threat of severe physical punishment. The enterprise's financial model was circular and self-reinforcing: fraud brought the children in, forced labor built and sustained the family's wealth, and sexual exploitation was concealed through the same institutional coercion that enforced the labor. This financial model was not confined to the Argiros family. Trial testimony confirmed that affluent members of the Hancock community provided funding for the original construction of the FFS campus. FFS's tuition and payroll revenue, processed for more than two decades through the sole bank branch operating in the Village of Hancock, constituted a disproportionately large share of that branch's commercial account activity in a village of fewer than 1,000 residents. Defendant Emmanuel Argiros individually owns and operates Smith's Colonial Motel and the Upper Delaware Inn within the Village, serves as Treasurer of the Hancock Area Chamber of Commerce, and serves as President of Hancock Partners, Inc., the Village's economic development organization, while Defendant

Cindy Argiros owns and publishes The Hancock Herald, the only newspaper serving the Village. In a community of fewer than 1,000 residents, the Argiros family in this way owned or controlled a substantial concentration of the Village's commerce, its civic and economic-development leadership, and its only local press, and the institutions that should have checked the enterprise, including the only bank, the local and county police, and the medical center, were instead financially dependent upon or beholden to the same family that ran it. This was not just one family profiting, it was a town whose commerce the family largely kept afloat, and which therefore had a financial stake in looking away. Every structural feature of FFS: the isolation of students from their families, the strip searches upon arrival, the work sanction coercion system, and the deliberate destruction of records, served simultaneously as a predicate act of the racketeering enterprise and as an independent breach of each Defendant's duty of reasonable care to the minor students in their custody. The two theories are not in conflict, they are two sides of the same institutional failure.

**3.** Separately and independently, FFS marketed itself to parents as a qualified therapeutic institution capable of treating adolescents suffering from drug and alcohol addiction, behavioral issues, and other conditions requiring professional intervention. Parents paid substantial tuition, in reliance on FFS's representations that enrolled students would receive care from licensed psychiatrists, psychologists, and clinical social workers. But FFS employed no qualified treatment professionals. Plaintiff, delivered to FFS by his parents on Defendants' assurances that he would receive qualified addiction treatment after becoming addicted to alcohol, drugs, and ultimately crack cocaine at age sixteen, received no genuine treatment, no medical care of substance, and no therapeutic support during his confinement, notwithstanding that his family paid Defendants approximately $99,000 over the course of his enrollment. He entered adulthood with unresolved trauma from both the addiction for which he was never treated and the institutional sexual-shame

program to which he was subjected in its place, and has spent approximately a decade of his adult life in therapy attempting to recover from it. These damages, untreated addiction, psychological injury, and the physical and psychiatric sequelae of the sexual-shame program, are standalone injuries caused by standalone negligence, governed by their own duties, breaches, and causation.

**4.** FFS's unlicensed and abusive operation was a matter of public record throughout Plaintiff's enrollment: in August 1990, the New York State Division of Alcoholism and Alcohol Abuse issued FFS a formal, public cease and desist order for operating without the license required by New York law. Paul Geer was on FFS staff throughout the entirety of Plaintiff's enrollment. Geer was tried in federal court in February 2025, was found guilty on March 3, 2025 following a two-week trial, and was sentenced on September 4, 2025 to 327 months (twenty-seven years and three months) in federal prison for his acts of sexual abuse at FFS and on school trips across state lines, providing direct judicial confirmation of the predicate conduct and institutional practices underlying Plaintiff's claims. The evidence and testimony adduced at those proceedings revealed for the first time the true nature of the enterprise responsible for Plaintiff's injuries, facts Defendants had deliberately concealed for decades, and gave rise to the filing of this action. Plaintiff learned of Geer's prosecution through a community of former FFS students, and that disclosure confirmed for him, for the first time, the coordinated and institutional nature of the abuse to which he and other students had been subjected. Sworn testimony at those proceedings further established that in approximately 2001, during Plaintiff's own enrollment, a victim notified Defendant Emmanuel Argiros that Geer had sexually assaulted him on an FFS trip to Toronto, and that no protective action followed; actual notice of Geer's conduct thus reached the president of the institution while Plaintiff remained confined there. Geer's conviction is cited herein as evidence of the enterprise's

structure, practices, and pattern of concealment. Plaintiff does not allege that Geer personally interacted with or abused him, and he is accordingly not named as a defendant in this action.

**5.** Plaintiff brings this action seeking compensatory damages of not less than $2,000,000 trebled where applicable under RICO, together with punitive damages, attorneys' fees, and costs as set forth herein.

**JURISDICTION AND VENUE**

**6.** This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) based upon Plaintiff's claims under 18 U.S.C. §§ 1589, 1590, 1591, 1594, 1595, 2255, and 1962 (RICO). This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

**7.** This Court has independent jurisdiction pursuant to 18 U.S.C. § 1964(c), which confers federal jurisdiction over civil RICO claims.

**8.** Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965 because a substantial part of the events and transactions giving rise to Plaintiff's claims occurred within the Northern District of New York. Specifically: (a) the Family Foundation School, the institution at which Plaintiff was confined, subjected to forced labor, and denied promised treatment, is located in Hancock, New York, within this District, and the principal conduct giving rise to Plaintiff's claims occurred there; (b) Plaintiff was recruited in South Carolina and, at Defendants' direction and arrangement, transported by interstate commerce from South Carolina to FFS in Hancock, New York, arriving on September 26, 2000; and (c) the tuition payments giving rise to Plaintiff's RICO injury were transmitted to and processed within this District.

**THE PARTIES**

**Plaintiff**

**9.** Plaintiff Adam Barley is an adult individual, born on September 20, 1983, who, as a sixteen-year-old minor, was recruited from South Carolina and enrolled at FFS from September 26, 2000 through approximately mid-2003, a period of approximately thirty-three months. At the time of his recruitment, Plaintiff had become addicted to alcohol and drugs and, by age sixteen, to crack cocaine, and had begun breaking into cars and houses; his mother, seeking help, found FFS and was told the school would provide him with addiction treatment.

**10.** Plaintiff's parents and grandmother paid FFS tuition of approximately $3,000 per month, or approximately $99,000 over the course of Plaintiff's enrollment, in reliance on Defendants' representations that FFS would provide Plaintiff with qualified addiction treatment.

**11.** Immediately upon his arrival, Plaintiff, then a minor, was strip searched by Defendants' employee, Larry Petriso in the presence of a fellow student.

**12.** Plaintiff was assigned to "Family 2" within FFS's family-unit structure, under the direct daily supervision of Defendants Michael Losicco and Roxanne Losicco ("Roxi"), throughout his enrollment.

**13.** Throughout his enrollment, Plaintiff was required to perform extensive uncompensated manual labor, including kitchen and dishwashing duty, receiving and inventorying the institution's food deliveries, chopping down and hauling trees, and mowing the property's grounds, under the supervision of Defendants Ed Anderson and Randy Whiting, among others.

**14.** Plaintiff was subjected to FFS's most severe isolation sanction, called "exile," under which he was confined, shortly after his seventeenth birthday, for approximately one to two weeks, to a cold hallway in winter, made to carry buckets of rocks through the snow, and made to shovel snow, while simultaneously subjected to a food sanction under which he was fed dry tuna, a green apple, and a glass of milk for lunch for approximately fourteen months, a deprivation FFS imposed regularly on most enrolled students, by which FFS withheld the food that tuition had already paid for, retained the difference, and unjustly enriched itself at its students', including Plaintiff's, expense. However brief in calendar terms, the exile sanction was profoundly destabilizing to Plaintiff, then a minor held in isolation in winter. Only through the facts exposed at the 2025 public federal criminal trial did Plaintiff come to understand that the punishment sold to him as treatment had in fact served to enrich the school, through his unpaid labor and the food withheld from him, and that he had never deserved it; only then could he begin to confront it through therapeutic intervention.

**15.** Plaintiff's contact with his parents was limited to a single five-minute monitored telephone call during his entire enrollment, during which FFS staff coached him on what he could and could not disclose about the conditions of his confinement. On one occasion, when Plaintiff attempted to run away, he was intercepted at the FFS office by Defendant Joseph Petriella, who had Plaintiff's father on the telephone and would not let him leave. On the single occasion during his enrollment when Plaintiff was permitted to travel home to South Carolina, FFS dispatched a chaperone to retrieve him and transport him back to the institution. During the early portion of Plaintiff's enrollment, Plaintiff personally witnessed students who attempted to flee being physically run down and restrained, including by being wrapped in rugs and duct tape; the dormitories were fitted with alarms to prevent departure; and later in Plaintiff's enrollment the Argiros Defendants

introduced the working dogs described herein to pursue and return students. The campus's remote location made escape effectively impossible, and Plaintiff has personal knowledge that students who fled were returned to the campus.

**16.** Plaintiff was subjected to a systematic program administered by FFS staff and its affiliated "sponsors" designed to convince him that, independent of his addiction, he was a "sex addict" and a "pervert." As part of a twelve-step curriculum that FFS required him to complete, his assigned sponsor for approximately the first year of his enrollment, Defendant Matthew Dingle, directed Plaintiff to write out every sexual act of his life prior to his arrival, including that he had had sex with his high-school girlfriend and had taken pornographic magazines from a bookstore, and then required Plaintiff to read that disclosure aloud before third parties. Plaintiff was separately required to attend group sessions led by Michael Ducey, in which he was made to discuss his nocturnal emissions ("wet dreams") before the group. Michael Ducey first instructed Plaintiff that if he became aroused or felt he was going to have an orgasm, he was required to physically stop it by holding the tip of his penis and reciting a prayer until the sensation passed; Defendant Dingle showed Plaintiff how to physically follow this directive through demonstration and physical touching and reinforced and coached him in it, and required him to discuss his adherence to it in forced "table topic" sessions before staff and other students. During Plaintiff's first confession at FFS, following a forced disclosure of sexual shame, Father Stephen Morris put his hands on Plaintiff and struck him in the head with an open hand, telling him he was never to have sex again until he was married. FFS staff referred to Plaintiff by the name "Tina" for a period of his enrollment as a further mechanism of sexualized humiliation. As part of the same regime, Plaintiff was required to use the bathroom under the observation of another student designated a "senior member" and assigned to monitor students against masturbation; was prohibited for over a year

from speaking to female peers; and was prohibited for a period of months from making eye contact with female staff. Defendant Dingle was succeeded as Plaintiff's assigned sponsor by Defendant Joseph Petriella and, during the later period of Plaintiff's enrollment, after Plaintiff had been designated a "senior member," by a further staff-assigned sponsor.

**17.** FFS additionally took Plaintiff on a tour of a state prison as part of a "scared straight" program, and, on one occasion when he became seriously ill, drove him a significant distance to a doctor in Binghamton, New York rather than providing care on campus.

**18.** Plaintiff never saw a psychiatrist more than once during his entire enrollment, and FFS employed no licensed, professional therapists capable of treating the addiction for which his family had enrolled him. The services FFS marketed and charged for were never provided: over thirty-three months of enrollment Plaintiff received no addiction counseling or treatment from any licensed or qualified professional, no psychiatric care beyond a single encounter, no psychological services, and no on-campus medical care of substance. In the place of the promised treatment, FFS administered forced labor, food deprivation, isolation sanctions, and coerced sexualized confession, so that the addiction for which Plaintiff's family paid approximately $99,000 was left wholly untreated while new and permanent injuries were inflicted upon him.

**19.** Although Plaintiff had done the work necessary to graduate high school, FFS repeatedly represented to his parents that he was not yet ready to graduate and should remain enrolled further, holding him at FFS until he was nearly twenty years old before permitting him to graduate and leave. In the final period of his enrollment, rather than permit Plaintiff to graduate, FFS coerced Plaintiff to remain for approximately six additional months in a purported "work study" program consisting of full days of unpaid physical labor with the school's maintenance crew, during which

Plaintiff took two college-credit courses of the kind provided through Defendant Lackawanna College as described herein and thereby extracting six months of additional tuition payments from Plaintiff, enriching Defendants.

**20.** After leaving FFS, Plaintiff attended college and graduate school, but continued a relationship with Defendant Dingle, who continued to counsel him along the same lines instilled at FFS. Between approximately 2010 and 2014, at Dingle's recommendation, Plaintiff attended a related residential program, referred to as "East Ridge," in Hankins, New York, near Callicoon, the same complex from which FFS had for years drawn staff, including Defendants Christopher Stein, Michael Ducey, Robin Ducey, and Dingle himself, all of whom resided there during the period of their affiliation with FFS. During this period, Defendant Dingle disclosed intimate details of his own sexual relationship with his wife to Plaintiff and used those disclosures to further instruct Plaintiff that he needed to work on his "purity," physically assaulted Plaintiff, and induced him, through further religious coercion, to cancel his homeowner's insurance policy shortly before Plaintiff's home was destroyed by fire, causing Plaintiff to lose his uninsured property. Upon information and belief, the fire resulted from torch-down roofing work performed by East Ridge personnel, including one Greg Hull. East Ridge's finances and primary functions were, upon information and belief, handled by Defendant Dingle together with Jacob Stein, and East Ridge operated on the same model as FFS, extracting unpaid labor from its participants, including Plaintiff, in the form of grounds work and the unpaid editing and mailing of its All Addicts Anonymous literature. East Ridge personnel further shamed Plaintiff out of pursuing his music career and discouraged him from maintaining contact with his family. Plaintiff's continued exposure to Dingle and the East Ridge complex from 2000 through 2014 is pleaded as a continuation of the same institutional program and enterprise personnel to which FFS first

subjected him as a minor. The FFS and East Ridge relationship operated as a closed referral pipeline: East Ridge supplied FFS with the staff who administered the program to confined minors, and those same staff then referred former students, including Plaintiff through Defendant Dingle's recommendation, back into the East Ridge program as paying adult participants, so that the enterprise continued to derive revenue and control from its subjects long after their departure from the school.

**21.** Since leaving FFS, Plaintiff has required ongoing urological treatment for a painful condition directly connected, in the assessment of his treating urologist, to having been made to physically restrain any nocturnal emission or orgasm during his confinement. Plaintiff has been treated by Dr. Turnquist of Turnquist Urology in Bloomfield, Connecticut (most recently seen in December 2025); Dr. Nelson Ploch of Palmetto Adult and Children's Urology in North Charleston, South Carolina; and Urology Associates of Charleston in Mt. Pleasant, South Carolina. Dr. Turnquist has confirmed that the trauma of this institutional practice was likely the cause of Plaintiff's ongoing condition.

**22.** Plaintiff has also suffered ongoing digestive issues since leaving FFS, treated by Dr. Gourdin of Charleston Gastroenterology Specialists, and his feet remain essentially always cold, a condition he attributes to the months he spent barefoot in a corner and to the prolonged outdoor labor he was forced to perform in freezing conditions.

**23.** Plaintiff has been diagnosed with anxiety and, according to his treating physician, Dr. Elizabeth Alve-Hedegaard, most likely obsessive-compulsive disorder, for which Dr. Alve-Hedegaard has prescribed Prozac, and which she has attributed to the intense, prolonged hypervigilance and self-shaming system instilled in Plaintiff at FFS. Plaintiff did not begin to

understand the true, injurious nature of that program until after approximately ten years of adult therapy, and, since approximately the time of Geer's federal prosecution, has undergone an additional two-year course of weekly EMDR therapy specifically to address it, a process that has required substantial emotional upheaval and financial sacrifice for Plaintiff and his wife. The instilled restraint practice and its accompanying shame persisted long after Plaintiff left FFS: Plaintiff continued to perform the physical restraint regimen into the present. Defendant Dingle reinforced the practice and the manufactured "sex addict" identity for years after Plaintiff's departure; and the unfounded "sex addict" label led Plaintiff to attend twelve-step sexual-addiction meetings for years after leaving FFS. It was not until the facts exposed at the 2025 public federal criminal trial that Plaintiff came to understand that the "sex addict" identity was not true at all, but a pathology manufactured by the enterprise and imposed on him and other students alike to deepen their dependence, prolong their enrollment, and enrich FFS through the tuition and unpaid labor that dependence secured; until that exposure, Plaintiff carried the label, and its practices, as though they were real.

**24.** Plaintiff was employed as a teacher at Intensive Education Academy in West Hartford, Connecticut, and was forced to leave that position after developing physical panic attacks triggered by the school's ordinary student-support protocols, which recalled his experiences at FFS.

**25.** As a direct and proximate result of Defendants' conduct, Plaintiff has suffered severe and lasting physical, psychological, and financial injury, including the ongoing cost of therapy, EMDR treatment, and massage therapy he has undertaken for years to manage the symptoms of his confinement and its aftermath, together with the loss of income and career opportunities those efforts have required. Plaintiff's damages include, without limitation: the approximately $99,000 in tuition paid for services never rendered, including the additional months of tuition extracted

through the false representations that he was not ready to graduate; the cost of past and future psychiatric, psychological, EMDR, urological, gastroenterological, and related care, which continues at one to two therapy sessions per week as Plaintiff enters his mid-forties; lost earnings and diminished earning capacity, including the teaching position Plaintiff was forced to leave; the years of educational and professional life lost to being held at FFS until he was nearly twenty; the value of the uncompensated labor extracted from him; and the uninsured property destroyed after Defendant Dingle induced him to cancel his insurance coverage.

**Defendants**

**26.** Defendant Education Plus Corp., doing business as Family Foundation School (hereinafter "FFS"), is a New York corporation with its principal place of business at 431 Chapel Hill Road, Hancock, New York 13783. FFS was the primary vehicle through which the racketeering enterprise operated, providing the institutional facade, physical campus, staff hierarchy, marketing apparatus, and referral network through which the Argiros family recruited, trafficked, and exploited minor students. FFS misrepresented to parents, courts, school districts, and referring agencies that it provided qualified therapeutic, psychiatric, psychological, and substance abuse treatment services to enrolled students meanwhile it employed no qualified professionals with which to provide such services. At all relevant times, including during Plaintiff's enrollment, FFS was owned, operated, and controlled by the Argiros Defendants.

**27.** Defendant Emmanuel Argiros a/k/a Michael Argiros is an individual who, at all relevant times, owned, operated, and directed FFS and Education Plus Corp. as president of the board from 1993 through the school's closure in 2014. Defendant Argiros was the principal architect and operator of the racketeering enterprise, made the decision to continue operating FFS

notwithstanding the active child-abuse investigation ongoing at the time of Plaintiff's enrollment, and personally destroyed evidentiary records by shredding. Defendant Argiros currently owns and personally operates KASOS Enterprises LLC d/b/a Smith's Colonial Motel at 23085 State Highway 97, Hancock, New York, operates Upper Delaware Inn at 521 W Main St, Hancock, NY 13783, serves as the President of Hancock Partners, Inc., a community and economic development organization serving the Village of Hancock, owns Kasos Co Family LP which was an owner of the land FFS ultimately sold far below market value, owns K9-5 Inc which developed as part of FFS's efforts to bring its students back to the school using canine searches, and which was formally incorporated in 2014 immediately after FFS ceased operations, and serves as Treasurer of the Hancock Chamber of Commerce.

**28.** Defendant Cindy Argiros, who publishes and is publicly known under the names "Cindy Ray" and "Cindy Ray Argiros," is an individual who, at all relevant times, served as a family leader, administrator, and operator of FFS and participated directly in the enterprise's operation, including, upon information and belief, personally supervising and participating in the forced labor to which Plaintiff was subjected. Defendant Cindy Argiros is additionally the owner, editor, and publisher of Defendant The Hancock Herald, the only local newspaper serving the Village of Hancock, which she operates under the name "Cindy Ray" --- a use of her maiden or alternate name that served to conceal the Argiros family's ownership of the Village's only newspaper from the public.

**29.** Defendant Betty Argiros co-founded FFS together with her husband and served as Program Director throughout the school's operation, including during Plaintiff's enrollment. Defendant Betty Argiros was the architect of the enterprise's operational policies, including the isolation and "blackout" sanction system, the work sanction coercion apparatus, and the sexual shaming and

degradation practices to which Plaintiff was subjected. As Program Director, Defendant Betty Argiros set the institutional policies that made the enterprise's predicate acts structurally possible and established the culture of impunity within which abuse was systematically concealed, including throughout Plaintiff's enrollment notwithstanding the active child-abuse investigation of which Defendants were aware.

**30.** Defendants Michael Losicco and Roxanne Losicco ("Roxi") were, at all relevant times, employees and agents of FFS who served as the "family leaders" of "Family 2," exercising direct daily supervision and control over Plaintiff throughout his enrollment.

**31.** Defendant Christopher Stein was, at all relevant times, an employee and agent of FFS and, upon information and belief, a resident of the affiliated East Ridge complex in Hankins, New York, from which FFS staffed its program.

**32.** Defendants Ed Anderson and Randy Whiting were, at all relevant times, employees and agents of FFS responsible for supervising portions of the outdoor and maintenance labor extracted from enrolled students, including Plaintiff.

**33.** Father Stephen Morris was, at all relevant times, an employee and agent of Defendant Education Plus Corp., serving as the on-campus priest at FFS and held out to students and parents as a source of pastoral and confessional care; he is not named as a defendant herein.

**34.** Michael Ducey and Robin Ducey, both now deceased, were, at all relevant times, employees or agents of FFS, and, upon information and belief, residents of the East Ridge complex, who administered the forced sexual-disclosure group sessions described herein.

**35.** Larry Petriso was, at all relevant times, an employee of Defendant Education Plus Corp. d/b/a Family Foundation School who conducted the strip search of Plaintiff upon his arrival.

**36.** Defendant Joseph Petriella was, at all relevant times, an employee or agent of FFS who, among other things, intercepted and prevented Plaintiff's attempt to run away.

**37.** Defendant Matthew Dingle was held out by FFS as Plaintiff's assigned sponsor for approximately the first year of Plaintiff's enrollment and, upon information and belief, a resident of and later an operator or agent at the East Ridge complex affiliated with and supplying staff and referring patrons including Plaintiff to FFS and later to East Ridge. Dingle directed the sexual-disclosure and self-restraint practices described herein during Plaintiff's enrollment as a minor, and continued a coercive relationship with Plaintiff into adulthood through the East Ridge program.

**38.** Defendant The Eastridge Corporation a/k/a High Ridge Property Company, Inc. ("East Ridge"), upon information and belief a residential twelve-step program in Hankins, New York founded by Thomas Powers, supplied a substantial portion of FFS's staff, including Defendants Stein, the Duceys, and Dingle, and received former FFS students, including Plaintiff, as continuing participants after their departure from FFS, thereby knowingly benefiting from and continuing the enterprise's practices beyond the FFS campus itself. Thomas Powers founded East Ridge and, upon information and belief, operated it during the relevant period; a book authored by Powers was incorporated into the required curriculum at FFS itself, through which the practices described herein were instilled in enrolled students, including Plaintiff. Upon information and belief, the East Ridge program later relocated to Honesdale, Pennsylvania.

**39.** Defendant Lackawanna College is a Pennsylvania institution of higher education with its principal place of business at 501 Jefferson Avenue, Scranton, Pennsylvania. Lackawanna College participated directly in the FFS enterprise by placing professors and instructors on the FFS campus in Hancock, New York to provide Advanced Placement and college-level courses to enrolled students as part of FFS's academic program. To the extent Lackawanna College's instructors were physically present on the FFS campus during Plaintiff's enrollment, Lackawanna College had actual or constructive institutional knowledge of the conditions under which students were held, the coercive environment in which its courses were delivered, and the pattern of abuse and exploitation that pervaded the institution. Lackawanna College received direct financial compensation from FFS for the educational services its instructors provided and derived direct reputational and enrollment benefit from the association with FFS's marketed academic program, while lending academic credibility to representations used to induce parents to place and retain students, including Plaintiff, at FFS.

**40.** Defendant National Association of Therapeutic Schools and Programs ("NATSAP") is a national membership and accreditation organization for therapeutic boarding schools and residential treatment programs, including FFS, which was a founding member of NATSAP. NATSAP accepted FFS as a founding member, lent FFS the institutional legitimacy of its membership designation, and published and promoted FFS's membership in its directories and marketing materials, which were used by parents, courts, and referring agencies and consultants, including Defendant Doe Education Consultant, as evidence that FFS met recognized standards for therapeutic residential programs. NATSAP received membership dues from FFS and derived organizational benefit from FFS's founding membership status throughout FFS's operation, including during Plaintiff's enrollment. NATSAP knew or should have known, through its

membership oversight responsibilities and its industry-wide knowledge of conditions at NATSAP member institutions, that FFS operated without the licenses, credentials, and professional staff its membership status implied it possessed, including at the time of Plaintiff's enrollment when FFS was already the subject of an active child-abuse investigation.

**41.** Defendant NBT Bank, N.A. is a federally chartered national bank with a full-service branch located at 11 East Main Street, Hancock, New York 13783 --- the same village in which FFS operated its campus and through which the enterprise described herein conducted its financial affairs. NBT Bank has maintained a continuous banking presence in the Village of Hancock since 1907, a period encompassing the entirety of FFS's operational life from its founding through its closure in 2014, including Plaintiff's 2000–2003 enrollment. Defendant NBT Bancorp Inc. is the publicly traded parent company of NBT Bank, N.A., incorporated in the State of Delaware with its principal executive offices at 52 South Broad Street, Norwich, New York 13815, registered with the United States Securities and Exchange Commission under Commission File Number 000-14703, and listed on the NASDAQ Stock Market under the ticker symbol NBTB, and is named as a defendant in its capacity as the controlling parent entity of NBT Bank, N.A. At all relevant times, NBT Bank, N.A. held one or more accounts in the name of Education Plus Corporation d/b/a Family Foundation School and in the individual names of Emmanuel Argiros, Cindy Argiros, and Betty Argiros, through which the tuition payments, including tuition paid on Plaintiff's behalf, payroll disbursements, and other financial proceeds of the racketeering enterprise described herein were deposited, processed, and disbursed. As the sole bank operating in the Village of Hancock throughout the relevant period, NBT Bank received substantial financial benefit from its account relationship with the enterprise --- including account fees, processing fees, and float income on deposit balances --- and knew or

should have known from the scale of that revenue, the corporate purpose stated in FFS's own account-opening documents, and the publicly available record of FFS's unlicensed and abusive operation, including the active child-abuse investigation ongoing at the time of Plaintiff's enrollment, that the enterprise from which it was receiving that benefit was engaged in the sexual exploitation and forced labor of the minor students in its clients' custody. NBT Bank turned a blind eye to those facts by utterly failing to investigate, report, or terminate the account relationship, rendering it a knowing beneficiary of the sex trafficking and forced labor venture.

**42.** Defendant The Hancock Herald is the only local newspaper serving the Village of Hancock, with its principal place of business at 102 East Front Street, Hancock, New York 13783. It is owned, edited, and published by Defendant Cindy Argiros, a principal of the enterprise, who operates it under the name "Cindy Ray." The Hancock Herald is not an independent press outlet but a business owned and controlled by the same family that owned and operated FFS, and it was financially intertwined with the enterprise: Argiros-owned businesses paid for advertising in its pages, and it published promotional content concerning FFS that furthered the enterprise's fraudulent marketing of the school to the families of prospective students, including Plaintiff's family, while it did not report the abuse, regulatory actions, or law enforcement complaints concerning FFS that were matters of public concern in the community it served.

**43.** Defendant Village of Hancock, New York is a municipal corporation organized under the laws of the State of New York. Defendant Village of Hancock Police Department ("Hancock PD") is the municipal police department of the Village of Hancock. Throughout the relevant period, including during Plaintiff's enrollment, the Village and Hancock PD derived substantial financial and political benefit from the Argiros family's economic entrenchment in Village

institutions, and, upon information and belief, were aware of the active child-abuse investigation of FFS ongoing at the time of Plaintiff's enrollment.

**44.** Defendant Delaware County Sheriff's Office is the law enforcement agency for Delaware County, New York, in which FFS is located, and Defendant Delaware County Board of Supervisors is the governing legislative body of Delaware County. At all relevant times, including during Plaintiff's enrollment, the Delaware County Sheriff's Office and Board of Supervisors exercised oversight authority over county institutions and, upon information and belief, were aware of the active child-abuse investigation of FFS ongoing at the time of Plaintiff's enrollment, yet permitted FFS to continue operating.

**45.** Defendant County of Delaware, New York ("the County") is a municipal corporation organized under the laws of the State of New York, within whose borders the FFS campus operated throughout the relevant period. The County acts through its departments, agencies, and officers, including the Delaware County Sheriff's Office and the Delaware County Board of Supervisors, and is the entity liable for the customs, policies, and practices of those bodies alleged herein. The Delaware County Sheriff's Office and the Delaware County Board of Supervisors are named herein as the arms of the County through which the conduct alleged was carried out, and all allegations against them are asserted against the County of Delaware.

**46.** Defendant Chapel Hill Land Holdings LLC is a New York limited liability company that acquired the FFS real property from Kasos Co Family LP in November 2014 and an additional parcel from Defendant Emmanuel Argiros in June 2016. Chapel Hill Land Holdings LLC took title with actual or constructive notice of the civil and criminal claims against the transferors, including notice arising from the presence and concealment of evidentiary records in a shed on

the transferred property that were subsequently recovered by the FBI as revealed during the 2025 criminal trial.

**47.** Defendant Kasos Enterprises LLC is a New York limited liability company owned and controlled by the Argiros Defendants. Defendant Kasos Co Family LP is a New York limited partnership likewise owned and controlled by the Argiros Defendants, which held title to the FFS real property and transferred it to Defendant Chapel Hill Land Holdings LLC in November 2014 at below-market value. Kasos Enterprises LLC owns the land on which the Upper Delaware Inn is situated, among other significant real property holdings in the Village of Hancock and surrounding area, and is an alter ego of the Argiros Defendants and of the other Kasos entities, sharing common ownership, common management, and common purpose.

**48.** Defendant K9-5 Inc. is a New York corporation whose corporate address remains the FFS campus grounds in Hancock, New York. The Argiros Defendants kept working dogs on the FFS property and used those dogs to track, pursue, and forcibly return students who attempted to escape the institution, ensuring that the minor students confined at FFS, including Plaintiff, could not flee the forced labor and coercive conditions to which they were subjected. The Argiros Defendants formalized this canine operation into the corporate entity now known as K9-5 Inc., which was capitalized with and developed out of the financial proceeds of the enterprise. K9-5 Inc. was officially incorporated in 2014, immediately after FFS ceased operations, and received the very dogs that had been used to pursue and return runaway FFS students, dogs trained through the uncompensated forced labor of the enterprise's minor students, together with the training lineage, goodwill, and business assets of the canine operation. K9-5 Inc. is accordingly liable both as a knowing beneficiary of the venture and as the successor in interest to, and mere

continuation of, the enterprise's canine operation, and it continues to hold and profit from the assets that operation generated.

## FACTUAL ALLEGATIONS

### A. The FFS Enterprise: Structure and Purpose

**49.** The FFS racketeering enterprise was an association-in-fact that operated through the FFS institution as its primary vehicle but extended beyond FFS to encompass a network of complicit local institutions, professional enablers, and the affiliated East Ridge complex, from which FFS drew a substantial portion of its staff and to which it later directed departing students, including Plaintiff. The enterprise was structurally distinct from any individual defendant and existed as an ongoing organization with its own staff hierarchy, marketing apparatus, physical campus, and financial infrastructure that persisted independently of any particular predicate act.

**50.** FFS marketed itself to the public, parents, courts, and referring school districts as a therapeutic boarding school offering weekly psychological and psychiatric services, drug and alcohol rehabilitation, therapeutic counseling grounded in the principles of Alcoholics Anonymous, and a rigorous academic program. In reality, FFS was founded and operated by individuals with no professional licensing, clinical training, or educational credentials relevant to the treatment of adolescent substance abuse, mental health disorders, or learning disabilities. FFS operated without a single license, certification, or trained professional required to deliver the therapeutic services it represented to parents, courts, and state authorities that it provided. FFS’s unlicensed status was, moreover, a matter of formal public record from the enterprise’s earliest years: in 1990, the New York State Division of Alcoholism and Alcohol Abuse notified FFS that it was operating without the license required by New York law and, in August 1990, issued FFS a formal, public cease and

desist order. FFS nonetheless continued to operate, and that order remained a publicly available state enforcement record throughout the ensuing decades, including at the time of Plaintiff's recruitment and confinement in 2000.

**51.** The enterprise operated for interlocking purposes: (a) extracting substantial tuition payments, including the approximately $99,000 paid on Plaintiff's behalf, from the families of enrolled students through misrepresentations about the nature and quality of services provided; (b) obtaining free child labor from enrolled students to construct and maintain the Argiros family's private estate and property, the construction and maintenance of which generated direct economic activity within the Village of Hancock and enriched the Argiros family's real property holdings; and (c) subjecting enrolled students to a sexualized institutional regime, administered in part through an affiliated network of "sponsors" and clergy, while maintaining through institutional coercion and external suppression the silence necessary to conceal the enterprise's true nature.

**52.** FFS recruited students by deliberately pathologizing normal adolescent behaviors, most of which could have been remedied through proper adolescent treatment during crucial developmental years which FFS purported to offer, including addiction, occasional alcohol use, minor disciplinary issues, and family conflict, to convince parents that FFS's intervention was necessary. FFS used its academic record, its arrangement with Defendant Lackawanna College, and its NATSAP membership as legitimacy shields to solicit and induce parents to enroll and retain their children, as occurred with Plaintiff, well beyond any legitimate program length.

**A.1. The Argiros Family's Economic Domination of the Village of Hancock**

**53.** The Village of Hancock is a small rural community in Delaware County, New York, with a population of fewer than 1,000 residents. Within a community of that size, the Argiros family

owned, operated, or controlled a substantial concentration of the businesses and civic institutions that made up the Village's commercial life, and, upon information and belief, ranked among the largest private commercial actors and employers in the Village. The family's economic footprint spanned lodging, hospitality, local media, economic development, and real property, and was anchored by FFS itself, which for more than two decades was among the largest economic engines operating within the Village.

**54.** Defendant Emmanuel Argiros owned and operated Smith's Colonial Motel and the Upper Delaware Inn, lodging and hospitality businesses serving the Village and the visitors drawn to the Upper Delaware region. Defendant Cindy Argiros owned, edited, and published The Hancock Herald, the only newspaper serving the Village, giving the family control of the sole organ of local news. Defendant Emmanuel Argiros served as Treasurer of the Hancock Area Chamber of Commerce and as President of Hancock Partners, Inc., the Village's economic-development organization, positions that placed the family at the center of the Village's commercial governance. Through Kasos Co Family LP, Kasos Enterprises LLC, and Chapel Hill Land Holdings LLC, the family held significant commercial and residential real property within and around the Village.

**55.** FFS was itself a dominant economic presence, enrolling a student body paying tuition of up to approximately $36,000 per year, including the tuition paid on Plaintiff's behalf, employing local staff, and routing its tuition revenue and payroll through the sole NBT Bank branch in the Village, where, upon information and belief, that revenue constituted a disproportionately large share of the branch's commercial account activity in a village of fewer than 1,000 people.

**56.** The consequence of this economic concentration was that the institutions whose independent oversight should have detected and halted the enterprise were instead financially dependent upon,

beholden to, or controlled by the same family that operated it, throughout the entirety of FFS's operation, including during Plaintiff's 2000–2003 enrollment.

**B. Negligent Operation of a Purported Therapeutic Institution and Fraudulent Misrepresentation of Therapeutic Capabilities**

**57.** Plaintiff was referred to FFS for the express purpose of receiving addiction treatment. Defendants represented to Plaintiff's family that FFS was equipped to provide such services.

**58.** FFS employed no medical staff and no licensed, professional therapists capable of delivering the treatment it represented to Plaintiff's family that it would provide. Plaintiff saw a psychiatrist only once during his entire enrollment. In lieu of genuine treatment, FFS subjected Plaintiff to isolation and food sanctions, uncompensated forced labor, and the sexualized shame regime described herein, none of which constitutes recognized addiction or mental-health treatment.

**C. FFS's Documented Unlicensed Operation and Institutional Knowledge**

**59.** By the time of Plaintiff's enrollment in 2000, FFS had operated for a decade under the public cease and desist order described supra, a formal state finding that the institution to which Plaintiff was delivered was operating in violation of New York licensing law. Defendants Education Plus Corp., Emmanuel Argiros, Betty Argiros, and Cindy Argiros had actual knowledge of that order and nonetheless continued to enroll and confine students, including Plaintiff, without the license their own marketing represented FFS to hold.

**60.** That knowledge is independently probative of Defendants' state of mind with respect to the conduct alleged throughout this Complaint: an enterprise that continues to operate and to enroll

students for a decade after being formally found to be operating unlawfully does so with actual, not merely constructive, knowledge of the wrongfulness of its practices.

**D. Forced Labor and Institutional Exploitation**

**61.** Trial testimony in the Geer federal criminal proceeding confirmed that FFS students were compelled to perform labor that directly and financially benefited the Argiros family without compensation and under threat of severe punishment, that labor sanctions were ordered and enforced by staff members and family leaders, and that students understood that failure to comply meant, in one witness's words, that they would "pretty much die here." This institutionalized practice, implemented systematically and known to enterprise leadership, continued into Plaintiff's 2000–2003 enrollment.

**62.** Plaintiff was personally subjected to multiple instances of forced labor, including kitchen and dishwashing duty, receiving and inventorying the institution's food deliveries, chopping down and hauling trees, and mowing the property's lawns. Plaintiff was placed on FFS's most severe sanction, called "exile," under which he was confined for approximately one to two weeks to a cold hallway in winter, made to carry buckets of rocks through the snow, and made to shovel snow, while simultaneously subjected to a food sanction under which he was fed a restricted diet for approximately fourteen months, a practice that, upon information and belief, was designed and maintained to reduce FFS's own food costs. The only mechanism by which Plaintiff could be released from an active sanction was to work harder and faster than other sanctioned students.

**E. The Sexualized Institutional Regime to Which Plaintiff Was Subjected**

**63.** As part of the enterprise's operation, Plaintiff, a minor, was strip searched upon arrival by Larry Petriso and subjected to a sustained institutional program administered by Defendant Dingle

and FFS staff members Michael Ducey, Robin Ducey, and Father Morris, and designed to convince him that he was a "sex addict" and a "pervert." Defendant Dingle, Plaintiff's assigned sponsor, directed him to write out and then read aloud, before third parties, every sexual act of his life prior to his arrival. Michael Ducey required Plaintiff to discuss his nocturnal emissions ("wet dreams") before a group. Michael Ducey first instructed Plaintiff in a practice of physically restraining his own arousal, coupled with forced prayer, and Defendant Dingle showed Plaintiff physically how to follow the same practice, and required him to report on his adherence to it in public sessions. FFS staff referred to Plaintiff by the degrading name "Tina" during this same period.

**64.** During Plaintiff's first confession at FFS, following a forced disclosure of sexual shame, Father Morris put his hands on Plaintiff, a minor, and struck him in the head, telling him he was never to have sex again until he was married.

**65.** Throughout his enrollment, Plaintiff came under the direct supervision and control of FFS staff and the Argiros Defendants, who used the institution's total control over minor students, including the work and food sanction system, isolation, and the practice of limiting and monitoring parental contact, to compel compliance with this program and to suppress disclosure of the conditions within the enterprise.

**66.** The tuition paid by Plaintiff's family to FFS, approximately $99,000 in total, constitutes a thing of value integral to the scheme within the meaning of 18 U.S.C. § 1591(e)(3): the sexualized regime to which Plaintiff was subjected occurred within, and as a function of, a program for which that tuition was continuously paid, and Defendants separately profited from the coercive sanction system, including Plaintiff's "exile" confinement, through which the regime was enforced.

**<u>F. Continuation of the Enterprise Through the Affiliated East Ridge Program</u>**

**67.** The enterprise did not end at the FFS campus gate or at Plaintiff's 2003 departure. FFS drew a substantial portion of its staff, including Defendants Stein, the Duceys, and Dingle, from the East Ridge complex in Hankins, New York, and, through Defendant Dingle, directed departing students, including Plaintiff, to continue their involvement with East Ridge as adults.

**68.** Between approximately 2010 and 2014, Plaintiff's continued relationship with Defendant Dingle at East Ridge extended the same coercive and sexually shaming program FFS had instilled in him as a minor: Dingle disclosed intimate details of his own sexual life to Plaintiff and tied those disclosures to Plaintiff's continued need to work on his "purity," physically assaulted him, and induced him to cancel his insurance coverage shortly before his home was destroyed by fire. This continuing venture, spanning FFS's campus operation and its affiliated East Ridge program, reflects a single ongoing enterprise whose personnel, methods, and objectives persisted beyond Plaintiff's formal FFS enrollment and beyond FFS's eventual 2014 closure.

**G. Paul Geer's Federal Criminal Conviction Established Evidence of Concealment**

**69.** Paul Geer was on FFS staff throughout Plaintiff's entire enrollment and was prosecuted in the United States District Court for the Northern District of New York for sexual abuse committed against students at FFS and during school trips across state lines. Geer was convicted following trial and sentenced to 27 years in federal prison. This conviction constitutes direct judicial confirmation of the predicate acts and institutional practices underlying Plaintiff's claims. Plaintiff does not allege that Geer personally interacted with or abused him, and Geer is accordingly not named as a defendant in this action; his conviction is pleaded solely as evidence of the enterprise's structure, practices, and pattern of concealment.

**70.** During the course of Geer’s federal criminal trial, evidence and testimony established that the Argiros Defendants intentionally destroyed documents relevant to the abuse at FFS by shredding them. It was not until the evidence and testimony adduced at Geer’s public federal criminal trial that Plaintiff first became aware that student files, counseling records, and other documentation had been deliberately shredded by the Argiros Defendants after FFS had been sued civilly and while Argiros was personally concerned about his own civil exposure.

**71.** The deliberate shredding of records constitutes: (a) spoliation of evidence giving rise to an adverse inference that the destroyed records contained information damaging to Defendants and favorable to Plaintiff; (b) an affirmative act of concealment in furtherance of the conspiracy; (c) obstruction of justice; and (d) fraudulent concealment independently tolling all applicable statutes of limitations from the date of shredding through the date Plaintiff first acquired knowledge thereof through the public proceedings of Geer’s federal criminal trial.

**72.** FFS, through its carrier, has previously paid civil settlements to other victims of FFS arising from the same pattern of abuse alleged herein, further establishing Defendants’ prior notice and knowledge of the pervasive and continuing nature of the enterprise.

**H. Evidence Established at the Geer Federal Criminal Trial**

**73.** The following facts were established through sworn testimony and evidence adduced at Geer’s federal criminal trial. This evidence confirms the institutional knowledge, deliberate concealment, and enterprise structure alleged herein and establishes the basis for Plaintiff’s fraudulent

concealment tolling argument, applicable across the entirety of FFS's operation including Plaintiff's 2000–2003 enrollment.

**74. Argiros Family Ownership and Control.** Defendant Michael Argiros testified that his parents owned the FFS property, his father served as executive director, his mother as program director, and that he became president of the board in 1993 and was actively involved in day-to-day operations throughout the relevant period.

**75. No System for Reviewing Abuse Complaints.** A regulatory letter admitted at trial confirmed FFS had no system to review, document, investigate, or report complaints of abuse. Susan Runge, an FFS employee and the designated recipient of abuse complaints, testified she could not confirm the total number of complaints received during her tenure, could not confirm she received all complaints, and could not describe any review process.

**76. Forced Labor Confirmed by Witness Testimony.** Multiple witnesses confirmed that FFS students were compelled to perform labor that directly and financially benefited the Argiros family without compensation and under threat of severe punishment, that labor sanctions were ordered and enforced by staff members and family leaders, and that purely punitive labor was imposed as a mechanism of psychological coercion.

**77. Town of Hancock Financial Nexus.** Trial testimony confirmed that affluent members of the Hancock community funded the original construction of the FFS campus, corroborating the community's financial stake in the enterprise's continued operation.

## I. Plaintiff's Damages

**78.** As set forth in the Plaintiff section, supra and incorporated herein by reference, Plaintiff has suffered ongoing urological injury requiring treatment by multiple urologists; ongoing gastrointestinal injury; what he now believes may be nerve damage in his feet; a diagnosis of anxiety and likely obsessive-compulsive disorder requiring prescription medication; and the need for approximately ten years of adult therapy, including an additional two-year course of weekly EMDR treatment and regular massage therapy.

**79.** Plaintiff was forced to leave his position as a teacher, where he made $24,000 per year, because the ordinary protocols of that school triggered physical panic attacks rooted in his experience at FFS, evidencing the continuing vocational impairment caused by Defendants' conduct.

**80.** As a direct and proximate result of Defendants' conduct, including their continued operation of FFS notwithstanding the 1990 cease and desist order and their extension of the same coercive program through the affiliated East Ridge complex, Plaintiff has suffered severe and lasting psychological injury, physical injury, and financial loss, and continues to incur substantial ongoing costs to manage the symptoms of his confinement and its aftermath.

## TOLLING OF STATUTES OF LIMITATIONS

**81.** Plaintiff's RICO and federal trafficking claims are timely. Plaintiff did not discover the true nature of the racketeering enterprise until he learned the details of Geer's federal criminal prosecution, and the limitations period began to run, at the earliest, upon that discovery. Independently, all applicable limitations periods are tolled by Defendants' fraudulent concealment, the self-concealing nature of the conspiracy, and the overt acts of concealment committed in furtherance of the conspiracy within the limitations period, as set forth below.

**82.** Independently and alternatively, all applicable statutes of limitations are tolled on each of the following independent grounds:

(a) **Fraudulent Concealment.** Defendants engaged in a coordinated scheme of affirmative concealment including: (i) FFS staff limited and monitored Plaintiff's contact with his parents and coached him on what he could disclose; (ii) Defendants continued to operate FFS notwithstanding the 1990 cease and desist order, without disclosing that order to Plaintiff's family; (iii) the Argiros Defendants admittedly and deliberately shredded student records, abuse complaints, and institutional documentation as confirmed by testimony at Geer's federal criminal trial, directly depriving Plaintiff of the evidentiary record necessary to discover and assert his claims. Plaintiff did not and could not through reasonable diligence have discovered the full scope of the enterprise within any applicable limitations period.

(b) **Self-Concealing Conspiracy**. The racketeering enterprise was specifically structured to prevent victims from connecting their individual experiences to the broader enterprise. The enterprise's mechanisms of isolation, the severance of students from family, friends, and outside support, including the limitation of Plaintiff to a single five-minute monitored call during his entire enrollment, were themselves instruments of concealment rendering victims structurally incapable of discovering the enterprise during enrollment or for years thereafter, a concealment extended and reinforced, as to Plaintiff, by Defendant Dingle's continued coercive relationship with him from 2000 through 2014.

(c) **Overt Acts Within the Limitations Period**. The deliberate shredding of student records by Argiros constitutes an overt act in furtherance of the conspiracy committed within the limitations period, as established by Argiros's sworn deposition testimony

from July 31, 2018 and confirmed at Geer's criminal trial through testimony in February 2025. The retention of student files, abuse complaints, institutional records, and other documentation in a shed on the FFS property following its fraudulent transfer to Chapel Hill Land Holdings LLC constitutes a further independent overt act of concealment falling entirely within the limitations period. The 2014 incorporation of K9-5 Inc., immediately upon the closure of FFS and during active civil litigation, and the contemporaneous transfer to it of the enterprise's canine operation, including the dogs used to pursue and return runaway students, constitutes a further independent overt act of asset disposition and concealment in furtherance of the conspiracy falling entirely within the limitations period.

**83. Straddle-Era Federal Claims**. 18 U.S.C. §§ 1589 and 1591 were enacted on October 28, 2000, one month into Plaintiff's enrollment; the great majority of his confinement therefore occurred after those offenses existed. The private civil right of action under 18 U.S.C. § 1595 was not created until December 19, 2003, after Plaintiff's departure from FFS. Plaintiff pleads, in the alternative, that § 1595 is a remedial statute providing a civil remedy for conduct that was already criminal, and that its application to Plaintiff's 2000–2003 conduct raises no substantial retroactivity concern; further and independently, the enterprise's conduct against Plaintiff did not end with his 2003 departure but continued as a single, ongoing course of conduct through the affiliated East Ridge program in which Plaintiff continued to participate through 2014, well after § 1595's enactment, and through FFS's own 2014 closure.

**84. Federal forced labor, sex trafficking, and labor trafficking claims (18 U.S.C. §§ 1589, 1591, 1595).** Plaintiff's claims are timely under 18 U.S.C. § 1595(c), together with discovery-based accrual and the fraudulent-concealment, equitable-estoppel, and self-concealing-conspiracy

grounds set forth above: Defendants' concealment prevented Plaintiff from discovering the enterprise's true nature, the limitations period did not begin to run until the discovery described herein, and Plaintiff filed this action promptly following that discovery.

**85. Masha's Law (18 U.S.C. § 2255).** Plaintiff's claims under 18 U.S.C. § 2255 are subject to no limitations period, as the Eliminating Limits to Justice for Child Sex Abuse Victims Act eliminated the statute of limitations for § 2255 claims not already time-barred as of September 16, 2022, and Plaintiff's claims, subject to discovery-rule accrual from his discovery of Geer's prosecution in 2025, were not time-barred as of that date.

**86. New York child trafficking civil action (Soc. Serv. L. § 483-bb).** Plaintiff's claim is timely on each of the following independent grounds: (a) the statutory suspension provision of § 483-bb(c)(iv); (b) equitable estoppel arising from Defendants' concealment; (c) the disability provision of § 483-bb(c)(iii) where it is shown that pursuit of the claim was rendered impossible or impracticable; (d) CPLR 212(e); and (e) common-law fraudulent concealment tolling as set forth supra. By the statute's express terms, each suspension ground under § 483-bb(c) applies to all other related claims arising out of the trafficking situation. Independently, Plaintiff's continued exposure to the same enterprise personnel and practices through the affiliated East Ridge program, extending to 2014, provides an independent, more recent accrual for that later conduct.

**87. Common-law fraud and negligent misrepresentation**. Plaintiff's claims are timely under CPLR 213(8), which permits an action to be commenced within the greater of six years from the fraud or two years from discovery. The two-year discovery period runs from the discovery described above, and this action is timely under both measures.

**88.** All applicable statutes of limitations on Plaintiff's negligence, negligence per se, and 42 U.S.C. § 1983 claims, otherwise governed by three-year limitations periods subject to the infancy toll of CPLR 208(a), are independently tolled by the fraudulent concealment and equitable estoppel doctrines set forth above.

**89.** Defendants are estopped from asserting any statute of limitations defense. A defendant cannot invoke the protection of a limitations period that its own wrongful conduct caused the plaintiff to miss.

## CAUSES OF ACTION

## COUNT I: CIVIL RICO (18 U.S.C. § 1962(c))

*(Against All Defendants)*

**90.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**The Enterprise.**

**91.** At all relevant times, Defendants constituted an enterprise within the meaning of 18 U.S.C. § 1961(4), as an association-in-fact that operated through the FFS institution and its affiliated East Ridge complex as its vehicles but was structurally distinct from any individual defendant. The enterprise existed as an ongoing organization with its own staff hierarchy, marketing apparatus, referral network, physical campus, and financial infrastructure that persisted independently of any particular predicate act. The enterprise shared the common purpose of enriching the Argiros family through tuition fraud, forced child labor, and sexual exploitation of minors, and operated as a continuing unit for decades, including throughout Plaintiff's 2000–2003 enrollment and its 2010–2014 continuation through East Ridge.

**92.** Each Defendant knowingly participated in the conduct of the enterprise's affairs as follows:

(a) The Argiros Defendants owned, operated, and directed the enterprise; made all decisions regarding staffing, student control, and continued operation notwithstanding the 1990 cease and desist order; personally committed predicate acts including record destruction; and financially benefited from every aspect of the enterprise's operation.

(b) Defendant Betty Argiros co-founded and co-operated the enterprise and designed and implemented the institutional policies through which the predicate acts were committed, including the work, food, and sexual-shame sanction system to which Plaintiff was subjected.

(c) The Losicco Defendants participated in the enterprise by administering the family structure and enforcing the work-sanction and isolation system against Plaintiff as direct instruments of the coercive control apparatus.

(d) Defendants Michael Ducey, Robin Ducey, Father Morris, and Dingle participated in the enterprise by administering the sexualized-shaming regime described herein against Plaintiff and, upon information and belief, other enrolled minors.

(e) Larry Petriso participated in the enterprise by conducting the strip search of arriving minors, including Plaintiff.

(f) Defendant East Ridge and its operators, participated in the enterprise by receiving FFS-trained staff and continuing to subject former FFS students, including Plaintiff, to the same coercive and sexually shaming program after their departure from FFS.

(g) Defendant NBT Bank, N.A. and NBT Bancorp Inc. knowingly advanced and benefited from the enterprise by processing the recurring substantial tuition payments and payroll disbursements of the enterprise, including tuition paid on Plaintiff's behalf, through NBT Bank's sole branch in the Village of Hancock for decades, while recklessly disregarding extensive publicly available information establishing FFS's abusive and unlicensed operation and further After Geer's 2025 public federal trial and conviction judicially confirmed the conduct of the enterprise whose accounts it had maintained throughout, NBT Bank purposely concealed its own involvement: it filed no Suspicious Activity Report, made no disclosure to any regulator or law enforcement agency, provided no documentation or evidence or testimony at the criminal trial, and took no corrective action, a deliberate concealment that continues into 2026. That purposeful silence after public exposure demonstrates that the bank's decades of participation were knowing rather than inadvertent, constitutes a continuing overt act in furtherance of the conspiracy alleged in Count II, and independently tolls all applicable limitations periods, as pleaded in the Tolling section supra and in Count VII.

(h) Defendant Lackawanna College lent academic credibility to the enterprise's marketing representations while its instructors were physically present in the environment where the exploitation was occurring.

(i) Defendant NATSAP lent membership legitimacy to FFS's fraudulent marketing representations.

(j) The Hancock Herald, owned and operated by Cindy Argiros under her maiden name to conceal the relation, concealed the true nature of the enterprise by contributing to FFS's fraudulent marketing to the public.

(k) Kasos Co Family LP facilitated the below-market fraudulent transfer of the FFS campus; Kasos Enterprises LLC and related entities maintain the Argiros family's ongoing financial entrenchment in Village institutions; K9-5 Inc. provided coercive infrastructure through training and deploying dogs to return runaway students.

(l) The Village and Hancock PD knowingly protected the enterprise from law enforcement scrutiny in exchange for the ongoing financial and political benefits derived from the Argiros family's patronage. The Delaware County Sheriff's Office and Delaware County Board of Supervisors participated in the enterprise's concealment and enabled its continued operation by permitting FFS to operate without proper licensure notwithstanding the 1990 cease and desist order.

**Pattern of Racketeering Activity.**

**93.** Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), including the following predicate acts committed repeatedly over a period exceeding ten years:

(a) **Forced Labor, 18 U.S.C. § 1589.** Defendants obtained labor and services from Plaintiff and other minor students through force, threats of physical harm, and a scheme of coercion, including the work and food sanction system described herein, all in furtherance of maintaining the Argiros family's property. The labor was performed without compensation and without consent.

(b) **Sex Trafficking of Minors, 18 U.S.C. § 1591**. Defendants recruited, harbored, and obtained minors, including Plaintiff, into a venture that subjected them to a sexualized

institutional regime, including the forced sexual disclosure, forced arousal-suppression practice, and physical striking described herein. Because Plaintiff and other victims were minors, no proof of force, fraud, or coercion is required.

(c) **Mail and Wire Fraud, 18 U.S.C. §§ 1341, 1343**. Defendants used the United States mail and interstate wire communications to transmit fraudulent recruitment materials, to collect tuition payments, including the approximately $99,000 paid on Plaintiff's behalf, and to advance the scheme to defraud families regarding the true nature of FFS.

**Continuity.**

**94.** The pattern of racketeering activity spanned multiple decades, encompassed numerous victims, and employed the same methods consistently over time, extending through Plaintiff's own continued exposure to enterprise personnel at East Ridge through 2014, and satisfying both closed-ended and open-ended continuity requirements.

**Conduct of the Enterprise.**

**95.** Each Defendant conducted or participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(c).

**Causation and Damages.**

**96.** Plaintiff was injured in his business and property by reason of Defendants' racketeering activity. Defendants obtained substantial tuition, approximately $99,000, paid on Plaintiff's behalf for addiction treatment they never provided, that tuition was a total economic loss, money paid for which nothing was delivered. These are concrete financial injuries to Plaintiff's business and property, independent of any physical or psychological injury and directly traceable to Defendants'

racketeering. Plaintiff is entitled to recover threefold that amount, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c). Plaintiff was further injured in his business and property through the destruction of the early years of his professional career. Plaintiff is today a music teacher and a working musician; that is his business and his livelihood. His entry into that profession was delayed by years as a direct result of the enterprise's scheme: FFS held Plaintiff until he was nearly twenty, including the six-month "work study" period of unpaid labor imposed in place of his graduation; the manufactured "sex addict" pathology consumed years of his early adulthood in twelve-step sexual-addiction meetings, the physical restraint regimen, and continued direction by Defendant Dingle, all in service of a condition the enterprise had invented; and the enterprise then referred Plaintiff into its affiliated East Ridge program, where from approximately 2010 through 2014 four additional years of his working life were extracted as unpaid labor while East Ridge personnel expressly shamed him out of pursuing his music career. Each year of that delay cost Plaintiff the professional income he would otherwise have earned as a teacher and performer, and the compounding professional progression, students, positions, repertoire, and reputation, that his profession builds year over year, permanently depressing his earning capacity in his trade. These are injuries to Plaintiff's business and property within the meaning of 18 U.S.C. § 1964(c), pleaded as direct economic consequences of the racketeering scheme, distinct from and in addition to Plaintiff's personal injuries.

**<u>Statute of Limitations.</u>**

**97.** All applicable limitations periods are tolled as set forth in the Tolling section supra.

**<u>COUNT II: RICO CONSPIRACY (18 U.S.C. § 1962(d))</u>**

*(Against All Defendants)*

**98.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**99.** Each Defendant agreed and conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly or indirectly, in the conduct of the affairs of the racketeering enterprise described in Count I through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). Each Defendant knew of the essential nature and scope of the enterprise and its scheme and knowingly agreed to participate in, facilitate, and further it. It is not necessary that any Defendant personally committed, or agreed personally to commit, a predicate act; it is sufficient under 18 U.S.C. § 1962(d) that each Defendant knowingly agreed to facilitate a scheme which, if completed, would constitute a violation of § 1962(c).

**100.** Plaintiff was injured in his business and property by reason of predicate acts of racketeering committed in furtherance of the conspiracy, and is entitled to recover threefold the damages he sustained, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT III: SEX TRAFFICKING OF A MINOR: PERPETRATOR LIABILITY (18 U.S.C. §§ 1591(a)(1) AND 1595)

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, and Matthew Dingle)*

**101.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**102.** Defendants Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Father Morris, Michael Ducey, Robin Ducey, and Dingle are liable as perpetrators under 18 U.S.C. §

1595 for their violations of 18 U.S.C. § 1591(a)(1), in that they recruited, harbored, and obtained Plaintiff, a minor, into and for the benefit of a venture that they knew and operated and that engaged in a sexualized institutional regime directed at the minor students in its custody. Each perpetrator Defendant named in this Count personally committed one or more of the acts enumerated in § 1591(a)(1), including Defendant Dingle's direction of Plaintiff's forced sexual disclosure and his instruction in and enforcement of the arousal-suppression practice, Michael Ducey's administration of the forced nocturnal-emission disclosure groups, Father Morris's physical striking of Plaintiff during a forced confession of sexual shame, and the harboring and obtaining of Plaintiff at FFS by Education Plus Corp. and the Argiros Defendants, pleaded by way of illustration and not limitation. All perpetrator Defendants acted in concert, in and for the benefit of a single venture, and each is jointly and severally liable for the acts of the venture committed in its furtherance.

**103.** Because Plaintiff was under 18 years of age at the time of the conduct, proof of force, fraud, or coercion is not required under 18 U.S.C. § 1591(a). Nonetheless, Defendants used all three: force through the work and food sanction system and Father Morris's direct physical strike; fraud through the representation that the sexual-disclosure and self-restraint program constituted legitimate addiction treatment; and coercion through a comprehensive system of institutional fear, isolation, and threatened and actual physical punishment.

**104.** Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including damages, attorneys' fees, and costs. All applicable statutes of limitations are tolled as set forth supra, including the straddle-era retroactivity analysis.

## COUNT IV: CIVIL RECOVERY FOR KNOWING BENEFICIARIES OF SEX TRAFFICKING (18 U.S.C. § 1595)

*(Against All Defendants)*

**105.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**106.** Each Defendant is liable under 18 U.S.C. § 1595 as a knowing beneficiary of the sex trafficking venture. Section 1595 imposes civil liability on any person or entity that knowingly benefits, financially or by receiving anything of value, from participation in a venture that the person knew or should have known was engaged in sex trafficking in violation of § 1591. Participation in a venture for purposes of this Count does not require participation in the sex trafficking itself, the provision of services to, and the maintenance of a continuous commercial relationship with, the venture suffices; the receipt of fees, tuition-derived revenue, and other revenue from the venture satisfies the benefit element; constructive knowledge is satisfied where a defendant ignored red flags including the 1990 cease and desist order; and the knowledge of a defendant's agents, acquired within the scope of their duties, is imputed to their principals.

**107.** Each Defendant benefited as follows: Defendants Education Plus Corp., Emmanuel Argiros, Betty Argiros, and Cindy Argiros received the tuition revenue that was the object of the venture; Defendant East Ridge and its operators, received continuing participation fees and the benefit of FFS-trained staff and referred former students, including Plaintiff, from approximately 2010 through 2014, conduct continuing long after Plaintiff's own departure from FFS; Defendant NBT Bank, N.A. and Defendant NBT Bancorp Inc. received substantial financial benefit in the form of account fees, processing fees, and float income on deposit balances representing tuition and payroll revenue processed through their Hancock branch, including tuition paid on Plaintiff's behalf;

Defendant Lackawanna College received financial compensation from FFS while its on-campus instructors provided the enterprise with an academic legitimacy shield; Defendant NATSAP received membership dues and promoted FFS's membership designation; Kasos Co Family LP, Kasos Enterprises LLC, and Chapel Hill Land Holdings LLC received and hold real property and assets generated by and through the enterprise; K9-5 Inc. was capitalized with and created out of the proceeds of the enterprise; and The Hancock Herald received advertising revenue from Argiros-affiliated businesses while suppressing any reporting of the enterprise's abuse and unlawful conditions. Each of these Defendants knew or should have known that the enterprise was engaged in sex trafficking and forced labor based on the publicly available 1990 cease and desist order and the pattern of abuse documented at FFS.

**108.** Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs from all Defendants jointly and severally. All applicable statutes of limitations are tolled as set forth supra, and the claims against Defendant East Ridge rest additionally on its own conduct continuing through 2014.

## COUNT V: FORCED LABOR: PERPETRATOR LIABILITY

## (18 U.S.C. §§ 1589 AND 1595)

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Michael Losicco, Roxanne Losicco, Ed Anderson, and Randy Whiting)*

**109.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**110.** 18 U.S.C. § 1589 prohibits obtaining labor or services from a person through force, threats of physical harm, physical restraint, abuse of legal process, or a scheme of coercion. Defendants Education Plus Corp., Emmanuel Argiros, Betty Argiros, and Cindy Argiros directly obtained

labor and services from Plaintiff and other minor students through: (a) physical isolation and threats of continued punishment; (b) a scheme of coercion through the work and food sanction system, including the “exile” sanction described herein; and (c) psychological coercion creating a pervasive climate of fear and compliance. The labor was obtained without compensation and without consent. Defendant Betty Argiros designed and implemented the coercive apparatus through which forced labor was extracted from minor students. Defendants Michael Losicco and Roxanne Losicco, as the family leaders directly responsible for Plaintiff’s day-to-day supervision, administered the coercive family structure through which work and food sanctions were imposed upon Plaintiff. Defendants Ed Anderson and Randy Whiting directly supervised and enforced portions of that labor.

**111.** Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys’ fees, and costs. All applicable statutes of limitations are tolled as set forth supra.

## COUNT VI: CIVIL RECOVERY FOR KNOWING BENEFICIARIES OF FORCED LABOR (18 U.S.C. § 1595)

*(Against All Defendants)*

**112.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**113.** 18 U.S.C. § 1595 provides a civil cause of action against any person or entity that knowingly benefits, financially or by receiving anything of value, from participation in a venture it knew or should have known was engaged in forced labor in violation of 18 U.S.C. § 1589. The standards set forth in Count IV, including that participation in a venture does not require participation in the forced labor itself, that receipt of revenue from the venture satisfies the benefit element, that

reckless disregard of red flags satisfies constructive knowledge, and that the knowledge of agents is imputed to their principals, apply equally to this Count. Each Defendant benefited from the forced labor venture as follows: Defendants Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, and the Losicco Defendants received the direct value of Plaintiff's uncompensated labor and the tuition revenue of an enterprise whose operating costs that labor eliminated; Defendant NBT Bank, N.A. and NBT Bancorp Inc. received account fees, processing fees, and float income on deposits representing in part the financial proceeds of an enterprise sustained by forced minor labor; Defendant Lackawanna College received financial compensation from FFS while its on-campus instructors observed and failed to report the conditions of coerced labor to which enrolled students were subjected; Kasos Co Family LP, Kasos Enterprises LLC, and Chapel Hill Land Holdings LLC hold real property and assets that were constructed, maintained, and generated in whole or in part through the forced, uncompensated labor of minor students; and K9-5 Inc., whose corporate address remains the FFS campus grounds, was capitalized with and created out of the proceeds of the enterprise. Each of these Defendants knew or should have known that the enterprise was engaged in the forced labor of minor students based on the publicly available 1990 cease and desist order.

**114.** Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs from all Defendants jointly and severally. All applicable statutes of limitations are tolled as set forth supra.

## <u>COUNT VII: CIVIL RECOVERY FOR OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1591(d) AND 1595)</u>

*(Against NBT Bank, N.A. and NBT Bancorp Inc.)*

**115.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**116.** At all relevant times, NBT Bank maintained accounts for Education Plus Corporation d/b/a Family Foundation School and for Emmanuel Argiros, Cindy Argiros, and Betty Argiros individually, and, upon information and belief, for additional entities affiliated with or controlled by the Argiros Defendants through which the financial proceeds of the enterprise were deposited, transferred, and disbursed.

**117.** 18 U.S.C. § 1591(d) makes it unlawful to obstruct, attempt to obstruct, or in any way interfere with or prevent the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action to victims of that violation. NBT Bank obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591 by maintaining the FFS account relationship and continuing to process the enterprise's financial transactions without filing a Suspicious Activity Report and without terminating that relationship, notwithstanding the 1990 cease and desist order and the extensive publicly available record of FFS's abusive and unlicensed operation, through FFS's 2014 closure and continuing through the bank's actual notice of the enterprise's conduct following the 2024–25 Geer proceedings. NBT Bank's reporting obligation arose independently at each of three escalating stages of notice: the August 1990 public cease and desist order; the 2014 closure of FFS and the below-market transfer of its campus, with the enterprise's records concealed on the transferred property; and the 2025 federal conviction of Geer, which judicially confirmed the conduct of the enterprise whose accounts the bank had maintained throughout. At no stage did NBT Bank file a Suspicious Activity Report or terminate the relationship, and its failure to report is independent of, and not excused by, the knowledge or conduct of any other party. That concealment continues to the present: notwithstanding the 2025 judicial confirmation, NBT Bank has made no report and taken no corrective action, a continuing violation extending into 2026.

**118.** This obstruction claim runs on the conduct of NBT Bank itself, independent of the era of Plaintiff's own victimization, and is accordingly timely on its face; the injury to Plaintiff is the concealment-delay of his claims and the destruction and dissipation of evidence and recoverable assets that NBT Bank's continued processing enabled. Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees, and costs.

## COUNT VIII: NEW YORK CHILD TRAFFICKING CIVIL ACTION (SOC. SERV. L. § 483-bb)

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, the Losicco Defendants, Dingle, and The Eastridge Corporation)*

**119.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**120.** Soc. Serv. L. § 483-bb provides a civil action for victims of conduct violating Penal Law §§ 230.34 (sex trafficking), 230.34-a (child sex trafficking), and 135.35 (labor trafficking), reaching all persons and entities who knowingly advance or profit from the trafficking venture.

**121.** The Argiros Defendants directly advanced and profited from the trafficking by receiving substantial tuition payments, including the approximately $99,000 paid on Plaintiff's behalf, extracted through fraudulent misrepresentations to parents, and by receiving the direct financial benefit of Plaintiff's uncompensated labor. Defendant East Ridge and its operators, continued to advance and profit from the same trafficking pattern through Plaintiff's continued participation from approximately 2010 through 2014, conduct that post-dates Penal Law § 135.35's 2007 enactment and § 230.34-a's 2018 enactment, leaving only the single, narrower contest as to § 483-bb's own 2015 remedial-enactment date, a materially stronger posture than Plaintiff's FFS-era conduct alone would present.

**122.** Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees, and costs pursuant to § 483-bb. All applicable statutes of limitations are tolled as set forth supra.

## COUNT IX: CONSPIRACY TO BENEFIT FROM SEX TRAFFICKING AND FORCED LABOR (18 U.S.C. §§ 1595 AND 1594(c))

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, the Losicco Defendants, and Dingle)*

**123.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**124.** The Defendants named in this Count each possessed actual knowledge of the sex trafficking and forced labor venture operated through FFS and, as to Dingle and East Ridge, its continuation, and knowingly agreed to participate in and further its unlawful objectives: namely, to enroll minors at FFS through fraudulent misrepresentations, to subject enrolled students to forced labor and sexualized exploitation, to suppress and conceal all reports of abuse, and to profit from the foregoing scheme. 18 U.S.C. § 1595, as amended, confers a civil cause of action against any person who "conspires to benefit," financially or by receiving anything of value, from participation in a venture that the person knew or should have known was engaged in sex trafficking or forced labor in violation of this chapter, and 18 U.S.C. § 1594(c) and (b) make conspiracy to violate § 1591 and § 1589 independent offenses giving rise to that civil liability.

**125.** In furtherance of this conspiracy, the named Defendants committed or directed overt acts described throughout this Complaint, including: the sexualized shaming and forced disclosure program to which Plaintiff was subjected; the continued operation and enrollment of students notwithstanding the 1990 cease and desist order; intimidation of victims through the work and

food sanction system; the Losicco Defendants' direct daily control over Plaintiff; and the continuation of the same program through the East Ridge complex from 2010 through 2014.

**126.** Plaintiff suffered harm as a direct and proximate result of this conspiracy and is entitled to compensatory and punitive damages from all co-conspirators jointly and severally.

## COUNT X: NEGLIGENT FAILURE TO PROVIDE PROMISED ADDICTION TREATMENT, FRAUDULENT AND NEGLIGENT MISREPRESENTATION, AND DECEPTIVE ACTS AND PRACTICES

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Lackawanna College, and NATSAP)*

**127.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**128.** These claims are pleaded simultaneously with, and without prejudice to, all other theories of liability set forth in this Complaint pursuant to Federal Rule of Civil Procedure 8(d). Defendants owed Plaintiff a distinct duty of reasonable care arising from their express representations that FFS would provide qualified addiction treatment to enrolled students with identified needs. That duty was breached by Defendants' total failure to employ qualified professionals or deliver any of the promised services during a critical period of Plaintiff's adolescent development.

**129.** Defendants breached their duty of reasonable care by: (a) failing to employ any qualified psychiatric, psychological, or licensed therapeutic professionals on a full-time basis; (b) failing to conduct any meaningful evaluation, diagnosis, or treatment planning for Plaintiff's addiction; (c) failing to provide any evidence-based therapeutic intervention or substance abuse treatment during Plaintiff's enrollment; (d) substituting a punitive sexual-shame program for genuine treatment; and

(e) continuing to enroll and confine students, including Plaintiff, notwithstanding the 1990 cease and desist order.

**130.** Through its publicly accessible marketing materials, its arrangement with Defendant Lackawanna College, and its NATSAP founding membership designation used as a legitimacy imprimatur, FFS and the Argiros Defendants represented to Plaintiff's family that FFS was a qualified therapeutic boarding school staffed by licensed professionals capable of treating adolescent addiction. Each of these representations was false at the time it was made, and Plaintiff's family justifiably relied on them in placing and retaining Plaintiff at FFS and in paying substantial tuition, approximately $99,000, therefor.

**131.** As a direct and proximate result of Defendants' negligent and fraudulent conduct, independently of any other theory of liability in this Complaint, Plaintiff suffered the injuries described herein and is entitled to compensatory damages, punitive damages, and treble damages and mandatory attorneys' fees pursuant to N.Y. General Business Law § 349(h). This claim is timely pursuant to CPLR 213(8), as set forth in the Tolling section supra.

## COUNT XI: NEGLIGENCE AND NEGLIGENT SUPERVISION AND RETENTION

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, and Cindy Argiros)*

**132.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**133.** Pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d), and without prejudice to the intentional conduct theories set forth in the preceding counts, the Argiros Defendants and FFS owed Plaintiff and other enrolled minor students a non-delegable duty of

reasonable care, including a duty to protect students from foreseeable harm caused by FFS staff and its affiliated sponsors and clergy.

**134.** The conduct described in the factual allegations herein, including without limitation the continued operation and enrollment of students, including Plaintiff, notwithstanding the 1990 cease and desist order; the failure to implement any system for reviewing, documenting, investigating, or reporting abuse complaints; the failure to supervise staff, including Defendants Morris, the Duceys, Dingle, and Petriso, with unsupervised access to minor students; and the deliberate design and implementation of the work, food, and sexual-shame sanction system by Defendant Betty Argiros as a mechanism of coercive control, constitutes a breach of the duty of reasonable care owed to Plaintiff that created an unreasonable and foreseeable risk of harm directly and proximately causing the injuries Plaintiff sustained.

**135.** As a direct and proximate result of Defendants' negligence, Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages. All applicable statutes of limitations are tolled as set forth supra.

## COUNT XII: CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983

*Fourteenth Amendment: Deliberate Indifference to Known Abuse*

*(Against the Village of Hancock, New York; the Village of Hancock Police Department; the County of Delaware, New York; Delaware County Sheriff's Office; and Delaware County Board of Supervisors)*

**136.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**137.** At all relevant times, the Village, Hancock PD, the Delaware County Sheriff's Office, and the Delaware County Board of Supervisors acted under color of state law within the meaning of 42 U.S.C. § 1983.

**138.** Plaintiff possessed a constitutionally protected liberty interest in personal security and bodily integrity under the Fourteenth Amendment.

**139.** Upon information and belief, and consistent with the pattern of deliberate indifference alleged as to other FFS students across multiple years, Hancock PD and the Delaware County Sheriff's Office were aware of the 1990 cease and desist order and the pattern of abuse it evidenced, and nonetheless permitted FFS to continue operating without effective oversight throughout Plaintiff's 2000–2003 enrollment. The Delaware County Board of Supervisors' failure to exercise oversight authority over the Sheriff's Office notwithstanding that knowledge constitutes a policy or custom of deliberate indifference to known, ongoing child abuse for which the County is liable.

**140.** As a direct and proximate result of Defendants' deliberate indifference, Plaintiff continued to suffer conditions that would have been halted had Defendants fulfilled their constitutional obligations. Plaintiff is entitled to compensatory damages, punitive damages, and attorneys' fees pursuant to 42 U.S.C. § 1988. All applicable statutes of limitations are tolled as set forth supra.

## COUNT XIII: NEGLIGENCE PER SE / FAILURE TO REPORT CHILD ABUSE

*(Against Michael Losicco, Roxanne Losicco, the Village of Hancock, the County of Delaware, New York, the Village of Hancock Police Department, and Delaware County Sheriff's Office)*

**141.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**142.** At all relevant times, New York law imposed mandatory reporting obligations on teachers, school officials and personnel, social workers, child care workers, and law enforcement officers who had reasonable cause to suspect that a child had been subjected to abuse or maltreatment. These obligations existed and applied to Defendants during the period of Plaintiff's enrollment at FFS from 2000 through 2003.

**143.** Defendants Michael Losicco and Roxanne Losicco, serving as the family leaders with direct daily supervisory and custodial responsibility for Plaintiff throughout his enrollment, possessed direct knowledge of the conditions of coercion, isolation, and sexualized degradation to which Plaintiff was subjected, had reasonable cause to suspect that Plaintiff and other children in their care had been subjected to abuse or maltreatment, and failed to make any required report to child protective authorities.

**144.** Hancock PD and Delaware County Sheriff's Office personnel, upon information and belief, were aware of the 1990 cease and desist order and were required as mandatory reporters and law enforcement officers to investigate conditions at FFS and to ensure compliance with reporting obligations by FFS personnel, and systematically failed to fulfill these obligations.

**145.** The failure to report constitutes negligence per se, as Defendants violated a statute specifically designed to protect children such as Plaintiff from the continued abuse that predictably resulted from their silence. Plaintiff is entitled to compensatory and punitive damages. All applicable statutes of limitations are tolled as set forth supra.

**COUNT XIV: MASHA'S LAW (18 U.S.C. § 2255 VIA 18 U.S.C. §§ 2421 AND 2423(a))**

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, and Cindy Argiros)*

**146.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**147.** 18 U.S.C. § 2255 provides that any person who, while a minor, was a victim of a violation of an enumerated predicate statute, including 18 U.S.C. § 2423, in force throughout the relevant period, and who suffers personal injury as a result may recover the actual damages such person sustains or liquidated damages, together with punitive damages, the cost of the action, and reasonable attorneys' fees.

**148.** While a minor, Plaintiff was transported in interstate commerce, including on a trip to a retreat house in Pennsylvania chaperoned by Father Morris and on a choral trip to Toronto, Canada organized and funded by FFS. Plaintiff was additionally transported in interstate commerce on his chaperoned return from South Carolina to FFS following the single home visit permitted during his enrollment, a transport undertaken so that Plaintiff would continue to be subjected to the program described herein. Father Morris's transport of Plaintiff to the Pennsylvania retreat house was undertaken and procured in connection with the same forced sexual-disclosure and shame program through which Morris struck Plaintiff during a confession of sexual shame, and with the intent that Plaintiff continue to submit to that program, satisfying § 2423(a)'s requirement that a purpose of the interstate transport was to engage in conduct that would constitute a criminal sexual offense. Defendants Education Plus Corp., Emmanuel Argiros, Betty Argiros, and Cindy Argiros authorized, funded, and organized both the Pennsylvania and Toronto trips through their institutional apparatus, conferred upon Father Morris the pastoral authority through which the Pennsylvania trip and its accompanying conduct were carried out, and are liable for the transport conducted through their agents and instrumentalities.

**149.** As a direct result of those violations, Plaintiff, while a minor, suffered personal injury, including the psychological and physical injury described herein.

**150.** This Count is subject to no limitations period: the Eliminating Limits to Justice for Child Sex Abuse Victims Act eliminated the statute of limitations for § 2255 claims not already time-barred as of September 16, 2022, and Plaintiff's claims, subject to discovery-rule accrual, were not time-barred as of that date. Plaintiff is entitled to recover his actual damages or liquidated damages, punitive damages, the costs of this action, and reasonable attorneys' fees, from the Defendants named in this Count jointly and severally.

## COUNT XV: COMMON-LAW FRAUD AND FRAUDULENT CONCEALMENT (CPLR 213(8))

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, and Cindy Argiros)*

**151.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**152.** Defendants Education Plus Corp., Emmanuel Argiros, Betty Argiros, and Cindy Argiros knowingly made material misrepresentations of fact to Plaintiff's parents and grandmother, including that FFS was a qualified therapeutic boarding school staffed to provide addiction treatment, psychological and psychiatric services, and a rigorous academic program; that Plaintiff would receive qualified addiction treatment for the addiction for which his family enrolled him; and, throughout his enrollment, that Plaintiff was not yet ready to graduate and needed to remain enrolled, when in fact he had completed the work necessary to graduate. Each of these representations was false when made, was known by these Defendants to be false, and was made with the intent that Plaintiff's family rely upon it.

**153.** Plaintiff's parents and grandmother reasonably relied on those misrepresentations, paying tuition of approximately $3,000 per month, approximately $99,000 in total, and keeping Plaintiff enrolled until he was nearly twenty years old, including additional months of tuition extracted through the false representation that he was not yet ready to graduate. Defendants reinforced and concealed the fraud through the devices described herein, including the monitoring and coaching of Plaintiff's sole telephone call with his parents so that the true conditions of his confinement could not be disclosed.

**154.** As a direct and proximate result, Plaintiff suffered the pecuniary and personal injuries described herein. This claim is timely pursuant to CPLR 213(8) and the Tolling allegations set forth supra. Plaintiff is entitled to compensatory and punitive damages from the Defendants named in this Count jointly and severally.

**COUNT XVI: LABOR TRAFFICKING (18 U.S.C. §§ 1590 AND 1595)**

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Michael Losicco, Roxanne Losicco, Ed Anderson, and Randy Whiting)*

**155.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**156.** In violation of 18 U.S.C. § 1590, the Defendants named in this Count knowingly recruited, harbored, transported, provided, and obtained Plaintiff, a minor, for labor and services in violation of 18 U.S.C. § 1589, as set forth in Count V: Plaintiff was recruited from South Carolina; transported in interstate commerce to the FFS campus at Defendants' direction and arrangement;

harbored and confined there for approximately thirty-three months while the forced labor described herein was extracted from him; and re-obtained through the chaperoned retrieval and return transport that followed the single home visit permitted during his enrollment, all for the purpose of subjecting him to that labor and those services.

**157.** As a direct and proximate result, Plaintiff suffered the injuries described herein and is entitled, pursuant to 18 U.S.C. § 1595, to compensatory damages, punitive damages, attorneys' fees, and costs from the Defendants named in this Count jointly and severally. All applicable statutes of limitations are tolled as set forth supra.

## COUNT XVII: ASSAULT, BATTERY, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*(Against Matthew Dingle, Education Plus Corp., Emmanuel Argiros, Betty Argiros, and Cindy Argiros)*

**158.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**159.** Larry Petriso committed battery upon Plaintiff, then a minor, by conducting the intake strip search described herein without consent or lawful justification. Father Stephen Morris committed assault and battery upon Plaintiff, then a minor, by striking him in the head with an open hand during a forced confession of sexual shame. Defendant Matthew Dingle committed battery upon Plaintiff by physically assaulting him during the East Ridge period described herein, as part of the continuing coercive relationship pleaded above.

**160.** The intake strip search was conducted pursuant to the uniform intake policy adopted, directed, and enforced by Defendants Education Plus Corp., Emmanuel Argiros, Betty Argiros,

and Cindy Argiros, and Father Morris's conduct occurred in the execution of the confession and sexual-disclosure program those Defendants adopted and enforced; these Defendants are directly liable for batteries committed in execution of the institutional policies they adopted and within the scope of the duties they assigned.

**161.** Independently, the course of conduct described herein, including the exile sanction, the starvation-level food sanctions, the compelled standing in a corner, the sexualized-humiliation program, and the coordinated campaign to convince a minor that he was a "pervert" and a "sex addict," was extreme and outrageous, was undertaken intentionally or with reckless disregard of the substantial certainty that it would cause severe emotional distress, and did cause Plaintiff the severe and ongoing emotional distress described herein.

**162.** As a direct and proximate result, Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages from the Defendants named in this Count jointly and severally. All applicable statutes of limitations are tolled as set forth supra, including pursuant to CPLR 208(b) as to conduct constituting sexual offenses committed against Plaintiff while he was a minor.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Adam Barley respectfully demands judgment against Defendants, jointly and severally, as follows:

(A) Compensatory damages in an amount to be determined at trial, including the cost of past and future medical, psychiatric, and therapeutic care, lost earnings and earning capacity, and restitution of all tuition and charges paid, but not less than $2,000,000;

(B) Treble damages pursuant to 18 U.S.C. § 1964(c), in an amount to be determined at trial;

(C) Punitive damages in an amount sufficient to punish Defendants for their willful, malicious, and egregious conduct and to deter similar conduct in the future;

(D) Attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c), N.Y. General Business Law § 349(h), 42 U.S.C. § 1988, and all other applicable statutes;

(E) Pre-judgment and post-judgment interest at the maximum rate permitted by law;

(F) Declaratory and injunctive relief as appropriate; and

(G) Any and all other relief this Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: Brooklyn, New York

July 31, 2026

Respectfully submitted,

**JOHANNESEN & UMANA, P.C.**

Attorneys for Plaintiff

By: ______________________________

Elizabeth Sarah Johannesen, Esq.

68 Jay Street, Suite 225

Brooklyn, New York 11201

elizabethsarahjohannesen@esjlaw.info

P: (631) 559-1018

By: ______________________________

Luis Umana, Esq.

68 Jay Street, Suite 225

Brooklyn, New York 11201

luisumana@esjlaw.info

P: (631) 559-1018

# VERIFICATION

STATE OF Connecticut )
) ss.:
COUNTY OF Hartford )

I, Adam Barley, Plaintiff in the foregoing Complaint, have read the Complaint and know its contents. The same is true to my own knowledge, except as to those matters alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 1, 2026.

Adam Barley, Plaintiff